**THE UNITED STATES DISTRICT COURT FOR**
**THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| VERONICA GALINDO, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>OLD NATIONAL BANK,<br><br>Defendant. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

## CLASS ACTION COMPLAINT

Plaintiff Veronica Galindo ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action complaint against Old National Bank ("ONB" or "Defendant"). Plaintiff makes the following allegations based upon, *inter alia*, the investigation made by her counsel, and based upon information and belief, except as to those allegations specifically pertaining to Plaintiff which are based on her personal knowledge and allege the following makes the following:

### NATURE OF THE ACTION

1. This is a proposed class action arising from Defendant's routine practices of assessing overdraft fees ("OD Fees") on transactions that did not actually overdraw an account.

2. Defendant misleadingly and deceptively misrepresents its fee practices including, in its take-it-or-leave-it form adhesion contract. The plain language of these contracts specifically promises that Defendant will only charge OD Fees on items when such items cause the account to have a negative balance.

3. As described herein, Defendant's practices violate the contract.

1

4. Defendant's improper scheme to extract funds from account holders has victimized Plaintiff and hundreds of other similarly situated consumers.

5. On behalf of herself and the Class, Plaintiff seeks, *inter alia*, damages and restitution as set forth more fully below.

## PARTIES

6. Plaintiff Veronica Galindo is a citizen and resident of Dekalb, Illinois and had a checking account with Defendant at all relevant times hereto.

7. Defendant is a bank headquartered in Evansville, Indiana with 228 locations across Illinois, Indiana, Iowa, Kentucky, Michigan, Minnesota, Tennessee, and Wisconsin. Defendant provides retail banking services to its members, including Plaintiff and members of the putative class.

## JURISDICTION AND VENUE

8. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because

    a. the proposed Class is comprised of at least 100 members; § 1332(d)(5)(B)

    b. at least one member of the proposed class is a citizen of a State other than Illinois (the State of which Defendant is a citizen), § 1332(d)(2)(A); and

    c. the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs. § 1332(d)(2), (6).

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

2

## BACKGROUND FACTS

10.    Overdraft fees and insufficient funds fees ("NSF fees") are among the primary fee generators for banks. According to a banking industry market research company, Moebs Services, in 2018 alone, banks generated an estimated $34.5 billion from overdraft fees. *See* Overdraft Revenue Inches Up in 2018, https://bit.ly/3cbHNKV.

11.    Unfortunately, the customers who are assessed these fees are the most vulnerable customers. Younger, lower-income, and non-white account holders are among those who were more likely to be assessed overdraft fees. *See* Overdrawn: Consumer Experiences with Overdraft, Pew Charitable Trusts 8 (June 2014), https://bit.ly/3ksKD0I.

12.    Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

13.    In line with this industry trend, the New York Attorney General asked other industry leading banks to end the assessment of all OD Fees by the summer of 2022. *NY Attorney General asks banks to end overdraft fees*, Elizabeth Dilts Marshall, Reuters (April 6, 2022).

14.    Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I.    DEFENDANT ASSESSES OVERDRAFT FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

### A.    Overview of the Claim

15.     Plaintiff Galindo brings this action challenging Defendant's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

16.     Here's how the practice works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

17.     However, Defendant still assesses crippling OD Fees on many of these transactions and misrepresents its practices in the Contract.

18.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

19.     Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the account holder and are specifically reserved for a given debit card transaction.

20.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

21.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

22.     Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

23.     The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners

found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.

At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, "Supervisory Highlights" (Winter 2015).

24.     The CFPB has also stated:

Consumers are likely to reasonably expect that a transaction that is authorized at point of sale with sufficient funds will not later incur overdraft fees. Consumers may understand their account balance based on keeping track of their expenditures, or increasingly through the use of mobile and online banking, where debit card transactions are immediately reflected in mobile and online banking balances. Consumers may reasonably assume that when they have sufficient available balance in their account at the time they entered into the transaction, they will not incur overdraft fees for that transaction. But consumers generally cannot reasonably be expected to understand and thereby conduct their transactions to account for the delay between authorization and settlement—a delay that is generally not of the consumers' own making but is the product of payment systems. Nor can consumers control the methods by which the financial institution will settle other transactions—both transactions that precede and that follow the current one—in terms of the balance calculation and ordering processes that the financial institution uses, or the methods by which prior deposits will be taken into account for overdraft fee purposes.

Consumer Financial Protection Bureau, "Circular 2022-06" (June 2016).

25.     The CFPB has even called out APSN transactions specifically as "unanticipated:"

Unanticipated overdraft fees can occur on "authorize positive, settle negative" or APSN transactions, when financial institutions assess an overdraft fee for a debit

card transaction where the consumer had sufficient available balance in their account to cover the transaction at the time the consumer initiated the transaction and the financial institution authorized it, but due to intervening authorizations, settlement of other transactions (including the ordering in which transactions are settled), or other complex processes, the financial institution determined that the consumer's balance was insufficient at the time of settlement. These unanticipated overdraft fees are assessed on consumers who are opted in to overdraft coverage for one-time debit card and ATM transactions, but they likely did not expect overdraft fees for these transactions.

*Id.*

26.     There is no justification for these practices, other than to maximize Defendant's OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

27.     But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

28.     Besides being deceptive, these practices breach contract promises made in Defendant's adhesion contracts, which fundamentally misconstrue and mislead consumers about the true nature of Defendant's processes and practices. Defendant also exploits its contractual discretion by implementing these practices to gouge its customers.

**A. Mechanics of a Debit Card Transaction**

29.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

30.     At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

31.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

32.     Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—when Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

33.     There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

**B.  Defendant's Contract**

34.     At all material times, Galindo maintained a checking account with Defendant, which was governed by Defendant's Account Contract.

35.     Defendant promised in the Account Contract that an overdraft occurs when there is not enough available balance in an account to pay an item.

36.     Except Galindo incurred overdraft fees on transactions authorized into a positive available balance.

37.   For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there is always enough money to cover the transaction—yet Defendant assesses OD Fees on them anyway.

38.   The promises made by Defendant in the contract indicate that transactions are only overdraft transactions when there is not enough money to cover the transaction at the time the customer swipes his or her debit card to pay for an item. Of course, that is not true for APSN Transactions.

39.   In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

40.   Defendant charges fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. Indeed, no express language in any document states that Defendant may impose fees on any APSN Transactions.

41.   Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

42.   Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its contractual promise not to do so. This discrepancy between Defendant's actual practice and the contract causes consumers like Galindo to incur more OD Fees than they should.

43.   Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

44.     Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

45.     Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time a transaction of authorization and later at the time of settlement.

46.     At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

47.     At the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

48.     This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

49.     In sum, there is a huge gap between Defendant's practices as described in the Contract and Defendant's actual practices.

**C.  Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**

50.     Defendant's assessment of OD Fees on transactions that have not overdrawn an account is inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent

transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

51.    Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

52.    Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

53.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

54.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have viewed debit cards (along with credit cards) "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MarketWatch (Mar. 23, 2016), https://on.mktw.net/3kV2zCH.

55.    Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

56.    Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How OD Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

57.    In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:



Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints

*Id.*

58.    Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

12

59.     Ultimately, unclear and misleading fee representations like those in Defendant's account documents mean that consumers like Plaintiff Galindo "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

60.     The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

61.     Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

62.     Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Contract only supports this perception.

63.     Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its members agree to these practices.

### D. Galindo Was Assessed OD Fees on Debit Card Transactions Previously Authorized on Sufficient Funds

64.     In August of 2022, Galindo was assessed OD Fees on debit card transactions that settled that day, even though the transactions had been previously authorized on sufficient funds.

65.     Because Defendant had previously held the funds to cover these transactions, Galindo's account always had sufficient funds to cover these transactions and should not have been assessed these fees.

### II. <u>NONE OF THESE FEES WERE ERRORS</u>.

66.     The improper fees charged by Defendant to Plaintiff' accounts were not errors by Defendant, but rather were systemic and intentional charges made by Defendant as part of its standard processing of transactions.

### III. THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

67.     Parties to a contract are required not only to adhere to the express conditions of the contract but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the bank or credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

68.     Here—in the adhesion agreements Defendant foisted on Plaintiff and its other customers—Defendant has provided itself numerous discretionary powers affecting customers' accounts. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees. Under Defendant's implied definition, a transaction is not covered even if Defendant sequesters sufficient available funds for that transaction. Moreover, Defendant uses its contractual discretion to cause APPSN transactions to incur OD fees by knowingly authorizing later transactions which it allows to consumer available funds previously sequestered for APPSN transactions.

69.     Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner and interprets the meaning of key

terms in an unreasonable way. By *always* assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. Indeed, Defendant exercises its contractual discretion to set the meaning of key terms to choose a meaning that directly causes more fees to its consumers.

## CLASS ALLEGATIONS

70. Plaintiff brings this action on behalf of herself, and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed class is defined as:

> All persons who, during the applicable statute of limitations, were checking account holders of Defendant and were assessed an overdraft fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.

71. Excluded from the Class are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, all customers who make a timely election to be excluded; governmental entities; and all judges assigned to hear any aspect of this litigation, their immediate family members, and chambers staff.

72. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

73. Plaintiff readily satisfy the requirements set forth in Federal Rule of Civil Procedure Rule 23(a) and (b).

74. <u>Numerosity</u>: The parties are numerous such that joinder is impracticable. Given the nature of the banking industry, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be

ascertained only by resort to Defendant's records. Defendant has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

75.     <u>Commonality</u>: The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. Such common legal or factual questions include, but are not limited to:

     a) Whether Defendant charged OD Fees on APSN transactions;

     b) Whether the conduct enumerated above violates the contract;

     c) Whether the conduct enumerated above violates the covenant of good faith and fair dealing; and

     d) The appropriate measure of damages.

18.     <u>Typicality</u>: Plaintiff's claims are typical of the claims of other members of the Class, in that they arise out of the same wrongful conduct, policies and practices. Plaintiff has suffered the same harm alleged and has no interests antagonistic to the interests of any other member of the Class. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Class and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Class. And Defendant has no unique defenses that would apply to Plaintiffs and not the Class.

76.     <u>Adequacy</u>: Plaintiff is a more than adequate representative of the Class in that Plaintiff is a checking accountholder and has suffered damages as a result of Defendant's contract violations. In addition:

     a) Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in

the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

b) There is no conflict of interest between Plaintiff and the unnamed members of the Class;

c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

77. <u>Predominance</u>: Common questions predominate over questions that may affect only individual class members because Defendant has acted on grounds generally applicable to the class. In other words, Defendant improperly and regularly charges its customers multiple fees on the same item and OD Fees on APSN transactions.

78. <u>Superiority</u>: It is impracticable to bring members of the Class's individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

79. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

80.     Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate corresponding declaratory relief with respect to the Class as a whole.

81.     All conditions precedent to bringing this action have been satisfied and/or waived.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Class)**

82.     Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1-81 as if fully set forth herein.

83.     Plaintiff and Defendant have contracted for bank account deposit, checking, ATM, and debit card services.

84.     Defendant mischaracterized in the contract its true fee practices and breached the express terms of the contract.

85.     No Contract provision authorizes Defendant to charge OD Fees on an APSN transaction.

86.     Under Illinois law, the covenant of good faith and fair dealing is an implied promise contained in every contract that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. Good faith is also mandated by the Uniform Commercial Code ("UCC"), which covers banking transactions.

87.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

88.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

89.     Defendant has breached the covenant of good faith and fair dealing through its overdraft policies and practices as alleged herein.

90.     Defendant harms consumers by abusing its contractual discretion in a number of ways that no reasonable customer could anticipate.

91.     Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them by the contract.

92.     Plaintiff and members of the Class have sustained damages as a result of Defendant's breach of the contract and breach of the covenant of good faith and fair dealing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court:

a.  Certify this case as a class action, designating Plaintiff as class representative and designating the undersigned as Class Counsel;

b.  Award Plaintiff and the Class actual damages in amount according to proof;

c.  Award Plaintiff and the Class restitution in an amount to be proven at trial;

d.  Award Plaintiff and the Class pre-judgment interest in the amount permitted by law;

e.  Award Plaintiff and the Class attorneys' fees and costs as permitted by law;

f.  Declare Defendant's practices outlined herein to be unlawful and a breach of contract;

g.  Grant Plaintiff and the Class a trial by jury;

h.  Grant leave to amend these pleadings to conform to evidence produced at trial; and

i.  Grant such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff, by counsel, demands trial by jury on all issues so triable.


Dated: September 9, 2024                    Respectfully submitted,


By: */s/ Andrew J. Shamis*
**SHAMIS & GENTILE, P.A.**
Andrew Shamis
Illinois Bar No. 6337427
14 NE 1st Ave, Suite 705
Miami, FL 33132
Telephone (305) 479-2299
Facsimile (786) 623-0915
Email: efilings@shamisgentile.com


**EDELSBERG LAW, P.A.**
Scott Edelsberg *
scott@edelsberglaw.com
20900 NE 30th Ave
Aventura, Florida 33180
Tel: (305) 975-3320

Jeffrey D. Kaliel*
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783
arosenberg@kalielgold.com
jkaliel@kalielpllc.com


**KALIELGOLD PLLC**
Sophia Goren Gold*
950 Gilman Street, Suite 200

Berkeley, CA 94710
Telephone: (202) 350-4783
sgold@kalielgold.com

*\* Pro Hac Vice* applications to be submitted
*Counsel for Plaintiff and the Proposed Class*